# In the United States Court of Federal Claims

**No. 16-548C**
**Filed: May 2, 2017**

```
* * * * * * * * * * * * * * * * * *  *
                                      *
IDAHO STAGE LLC,                      *
                                      *
              Plaintiff,              *
                                      *   Motion in Limine, Contract
      v.                              *   Interpretation; Request for Equitable
                                      *   Adjustment.
UNITED STATES,                        *
                                      *
              Defendant.              *
                                      *
* * * * * * * * * * * * * * * * * *  *
```

**John S. Stewart**, Stewart, Sokol & Gray, Portland, Or., for plaintiff.

**Vito Solitro**, Trial Attorney, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, D.C., for defendant. With him was **Allison Kidd-Miller**, Assistant Director, Commercial Litigation Branch, **Robert E. Kirschman, Jr.**, Director, Commercial Litigation Branch, **Chad A. Readler**, Acting Assistant Attorney General, Civil Division, Department of Justice, Washington, D.C.

## ORDER

**HORN, J.**

### FINDINGS OF FACT

Before the court is defendant's motion in limine seeking to bar plaintiff from presenting certain evidence or argument at trial. Plaintiff, Idaho Stage, LLC, (Idaho Stage) filed a complaint in the United States Court of Federal Claims alleging that defendant, the United States, acting through the Department of the Navy, Naval Facilities Engineering Command Northwest, changed the terms of the contract such that plaintiff is entitled to an equitable adjustment. According to the complaint, the parties entered into a task order contract, number N44255-14-D-9016, on February 26, 2015, for construction, renovation, alteration, demolition, and repair work of facilities located on Naval Base Kitsap in the State of Washington. The task order was awarded for a firm fixed price of $4,087,500.00.

Pertinent to the current motion in limine dispute between the parties, the contract called for a project superintendent and a Site Safety and Health Officer (SSHO). Contract section 1.6.2.1 describes the duties of the SSHO as follows:

The SSHO shall:

a. Conduct daily safety and health inspections and maintain a written log which includes area/operation inspected, date of inspection, identified hazards, recommended corrective actions, estimated and actual dates of corrections. Attach safety inspection logs to the Contractors' daily production report.
b. Conduct mishap investigations and complete required reports. Maintain the OSHA Form 300 and Daily Production reports for prime and sub-contractors.
c. Maintain applicable safety reference material on the job site.
d. Attend the pre-construction conference, pre-work meetings including preparatory inspection meeting, and periodic in-progress meetings.
e. Implement and enforce accepted APPs [Accident Prevention Plans] and AHAs [Activity Hazard Analysis].
f. Maintain a safety and health deficiency tracking system that monitors outstanding deficiencies until resolution. Post a list of unresolved safety and health deficiencies on the safety bulletin board.
g. Ensure sub-contractor compliance with safety and health requirements.
h. Maintain a list of hazardous chemicals on site and their material safety data sheets.

Failure to perform the above duties will result in dismissal of the superintendent, QC [Quality Control] Manager, and/or SSHO, and a project work stoppage.

Additional language concerning the SSHO is set forth in contract Section 01 35 26, which explains the "GOVERNMENTAL SAFETY REQUIREMENTS" that apply to contract performance. (capitalization in original). Contract Section 01 35 26 identifies publications that were intended to "form a part of this specification to the extent referenced." Section 1.5 of the contract specifications provides that, "[i]n addition to the detailed requirements included in the provisions of this contract," the contractor should "comply with the most recent edition of USACE [United States Army Corps of Engineers] EM 385-1-1," a manual describing safety and health requirements.[1]

---

[1] The EM 385-1-1 Manual prescribes the safety and health requirements for all United States Army Corps of Engineers activities and operations. Although the plaintiff referenced the 2011 version of the EM 385-1-1 Manual in its Notice of Relevant Documents submitted to the court, and plaintiff refers to the 2008 version of the EM 385-1-1 Manual in its response to defendant's motion in limine, the record before the court indicates that the 2014 version of the EM 385-1-1 Manual applies to the contract at issue in the above-captioned case. The 2014 version of the EM 385-1-1 Manual is dated "30 November 2014," and both the solicitation and contract were issued after November 30, 2014. The solicitation was issued on December 8, 2014, and the contract was issued on February 26, 2015. Accordingly, the court refers to the EM 385-1-1 Manual dated November 30, 2014.

With regard to the SSHO, the contract states at Section 01 35 26:

The SSHO must meet the requirements of EM 385-1-1 section 1 and ensure that the requirements of 29 CFR 1926.16 are met for the project. Provide a Safety oversight team that includes a minimum of one (1) person at each project site to function as the Site Safety and Health Officer (SSHO). The SSHO or an equally-qualified Designated Representative/alternate shall be at the work site at all times to implement and administer the Contractor's safety program and government-accepted Accident Prevention Plan. The SSHO's training, experience, and qualifications shall be as required by EM 385-1-1 paragraph 01.A.17, entitled SITE SAFETY AND HEALTH OFFICER (SSHO), and all associated sub-paragraphs.
(capitalization in original).

The EM 385-1-1 Manual sets forth SSHO requirements at section 01.A.17. According to section 01.A.17 of the EM 385-1-1 Manual, the contractor is required to "employ a minimum of one CP [Competent Person] at each project site to function as the SSHO (primary), depending on job complexity, size and any other pertinent factors." Additionally, section 01.A.17 states:

a. The SSHO shall:
    (1) Be a full-time responsibility. The SSHO shall be present at the project site, located so they have full mobility and reasonable access to all major work operations during the shift.
    (2) Be an employee other than the supervisor, unless specified differently in the contract and coordinated with the local SOH Office, and
    (3) Report to a senior project (or corporate) official.

(emphasis in original). Separate from section 01.A.17 of the EM 385-1-1 Manual, Appendix Q of the EM 385-1-1 Manual sets forth "Definitions," in which the SSHO is defined as "the superintendent or other qualified or competent person who is responsible for on-site safety and health." Unlike for the SSHO position, neither the contract, nor the EM 385-1-1 Manual, indicates whether the project superintendent position should be considered a full-time responsibility. Moreover, the Appendix Q "Definitions" section of the EM 385-1-1 Manual defines the SSHO as "the superintendent or other qualified or competent person who is responsible for on-site safety and health," suggesting the possibility of dual roles.

According to plaintiff, Idaho Stage's proposal, which was accepted by the government, for the contract award, assumed that the project superintendent also could serve as the SSHO. Only after the contract was awarded to plaintiff, and after a preconstruction conference was held, plaintiff submitted a request for information to defendant which indicated that "Idaho Stage planned for the Project Superintendent serve [sic] as the SSHO." Plaintiff explained to defendant that it understood that the contract specifications did not preclude the project superintendent from serving as the SSHO nor, according to plaintiff, did the contract specifications dictate that the SSHO could have no

3

other duties on the project. In its post-award request for information, plaintiff explained that "[g]iven the project size and scope, it is very reasonable to have a Superintendent that also serves as an SSHO." In response to plaintiff's request for information, defendant explained that the project superintendent and the SSHO shall not be the same person and that the SSHO should be an individual with no other responsibilities on the project. After defendant ordered plaintiff to have two separate individuals fill the two responsibilities, plaintiff submitted a certified claim for a request for equitable adjustment seeking $155,713.00 in estimated costs that would be incurred during contract performance as a result of "the Government's direction to have a full time SSHO on the project, with no other responsibilities." According to plaintiff, defendant's requirement that the project superintendent and the SSHO should not be the same person constituted a change under the changes clause of the contract. The contracting officer denied plaintiff's certified claim seeking an equitable adjustment in the amount of $155,713.00 in full. Subsequently, plaintiff filed its complaint in this court seeking $155,713.42, as well as for interest and costs.

On February 15, 2017, defendant filed a motion in limine seeking to bar plaintiff from presenting evidence or argument at trial that plaintiff was permitted to have its project superintendent also serve as the SSHO because such evidence or argument is precluded by the plain language of the contract and because plaintiff had failed to inquire about the issue prior to the proposal deadline. Plaintiff opposes defendant's motion and argues that there is no basis to exclude either argument or evidence that "go directly to the heart of this dispute" as to whether the project superintendent could serve in a dual role as the SSHO. The parties agree that the contract incorporates by reference the EM 385-1-1 Manual. The parties dispute, however, whether, under the terms of the contract, plaintiff's project superintendent could serve in a dual role also as the SSHO. After defendant's motion in limine was fully briefed, the court directed the parties to submit the contract, in its entirety, as well as plaintiff's proposal in response to the solicitation for the task order contract, for the court's review.

**DISCUSSION**

Defendant's motion argues that the plain language of the contract establishes that the SSHO position could not be held by the same person who also served as the project superintendent. According to defendant, section 01.A.17 of the EM 385-1-1 Manual requires that the SSHO be a full-time responsibility, which prohibits one person from performing the functions of the SSHO and another position, and prohibits the SSHO from being a supervisor. Defendant tries to rely on the 2014 version of section 01.A.17 of the EM 385-1-1 Manual, which states that the "[c]ontractor shall employ a minimum of one CP [Competent Person] at each project site to function as the SSHO (primary), depending on job complexity, size and any other pertinent factors." Defendant also offers additional language from the 2014 version of the EM 385-1-1 Manual section 01.A.17, which states that the SSHO shall "(1) Be a full-time responsibility. . . . (2) <u>Be an employee other than the supervisor</u>, unless specified differently in the contract . . . and (3) Report to a senior project (or corporate) official." (emphasis in original).

4

Additionally, defendant points to sections 1.6.1.1 and 1.7 of the contract specifications to support its position that the project superintendent could not serve as the SSHO under the terms of the contract. With regard to section 1.6.1.1 of the contract, defendant asserts that "section 1.6.1.1 requires that Idaho Stage '[p]rovide a Safety oversight team that includes a minimum of one (1) person at each project site to function as the Site Safety and Health Officer (SSHO).'" Defendant asserts that "a 'minimum of one' SSHO does not permit one-half or a part-time SSHO because of a combined role performed by one person." Defendant finds further support for its position in section 1.7 of the contract specifications, which describes the Accident Prevention Plans (APP) and states, "[o]nce work begins, changes to the accepted APP shall be made with the knowledge and concurrence of the Contracting Officer, project superintendent, SSHO and quality control manager."

Defendant acknowledges that "APPENDIX Q" to the EM 385-1-1 Manual, titled "Definitions," defines SSHO as "the superintendent or other qualified competent Person who is responsible for on-site safety and health." (capitalization in original). Defendant concedes that the EM 385-1-1 Appendix Q definition of SSHO "appears to permit the parties the freedom to contract and agree to an arrangement where the superintendent would also serve as SSHO if that is the intent of the parties." Defendant argues, however, "that is not what the parties to this contract agreed upon." Defendant asserts that "the contract specifications explicitly reference section 1 of the EM 385-1-1 manual," but the "contract specifications do not . . . reference the glossary [Appendix Q] definition of SSHO" in the EM 385-1-1 Manual. According to defendant, the court should apply the EM 385-1-1 provision specifically referenced in the contract specifications, including section 01.A.17, and not the definition in Appendix Q. Defendant further asserts that, if the Appendix Q definition of SSHO conflicts with the plain language of the contract specification and section 01.A.17 of the EM 385-1-1 Manual, then the ambiguity was patent and plaintiff was required to inquire about the dual roles before submitting its offer, but failed to do so.

In response to defendant's motion in limine, plaintiff argues that there is no language in the contract "which in plain terms clearly and specifically states that the Superintendent shall not serve as SSHO for the Project." According to plaintiff, the definition of the SSHO, as set forth in the 2011 version of Appendix Q of the EM 385-1-1 Manual, describes the SSHO as the "superintendent or other qualified or competent person who is responsible for on-site safety and health."[2] Plaintiff relies on this definition of the SSHO to support its position that the project superintendent could function as the SSHO under the terms of the contract. Plaintiff asserts that the contract required the SSHO to be a person physically present on the project site on a full time basis, however, the contract did not prohibit that individual from also serving as the project superintendent. Additionally, with regard to the requirement in section 01.A.17 that the SSHO be "<u>an employee other than the supervisor</u>," plaintiff asserts that a "supervisor" is distinguishable from a project superintendent and functions at a much lower level of management than the project superintendent. (emphasis in original).

---

[2] The definition of the SSHO is the same in the 2011 and 2014 versions of the EM 385-1-1 Manual.

5

The dispute between the parties in this case revolves around an issue of contract interpretation, specifically whether or not the contract permitted the project superintendent to serve in a dual role also as the SSHO. Contract interpretation is a question of law. See UPI Semiconductor Corp. v. Int'l Trade Comm'n, 767 F.3d 1372, 1377 (Fed. Cir. 2014) (stating that contract interpretation is a question of law); see also First Annapolis Bancorp, Inc. v. United States, 644 F.3d 1367, 1373 (Fed. Cir. 2011), cert. denied, 132 S. Ct. 2102 (2012); Holland v. United States, 621 F.3d 1366, 1374 (Fed. Cir. 2010), cert. denied, 132 S. Ct. 365 (2011); H.B. Mac, Inc. v. United States, 153 F.3d 1338, 1345 (Fed. Cir. 1998) (stating that matters of contract interpretation are questions of law); Dalton v. Cessna Aircraft Co., 98 F.3d 1298, 1305 (Fed. Cir.), reh'g denied and en banc suggestion declined (Fed. Cir. 1996); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. 372, 483 (2013) (quoting Varilease Tech. Group, Inc. v. United States, 289 F.3d 795, 798 (Fed. Cir. 2002)); C.W. Over & Sons, Inc. v. United States, 54 Fed. Cl. 514, 520 (2002).

Contract interpretation starts with an analysis of the language of the written agreement. See Precision Pine & Timber, Inc. v. United States, 596 F.3d 817, 824 (Fed. Cir. 2010), cert. denied, 131 S. Ct. 997 (2011); LAI Servs., Inc. v. Gates, 573 F.3d 1306, 1314 (Fed. Cir.), reh'g denied (Fed. Cir. 2009); Barron Bancshares, Inc. v. United States, 366 F.3d 1360, 1375 (Fed. Cir. 2004); Foley Co. v. United States, 11 F.3d 1032, 1034 (Fed. Cir. 1993); Eden Isle Marina, Inc. v. United States, 113 Fed. Cl. at 483–84; Bell/Heery v. United States, 106 Fed. Cl. 300, 309 (2012), aff'd, 739 F.3d 1324 (Fed. Cir. 2014), reh'g and reh'g en banc denied (Fed. Cir. 2014); Sterling, Winchester & Long, L.L.C. v. United States, 83 Fed. Cl. 179, 183 (2008), aff'd, 326 F. App'x 568 (Fed. Cir. 2009). The United States Court of Appeals for the Federal Circuit stated in Massie v. United States:

> In interpreting a contract, "[w]e begin with the plain language." "We give the words of the agreement their ordinary meaning unless the parties mutually intended and agreed to an alternative meaning." In addition, "[w]e must interpret the contract in a manner that gives meaning to all of its provisions and makes sense.'"

Massie v. United States, 166 F.3d 1184, 1189 (Fed. Cir. 1999) (quoting McAbee Constr., Inc. v. United States, 97 F.3d 1431, 1435, reh'g denied and en banc suggestion declined (Fed. Cir. 1996); Harris v. Dep't of Veterans Affairs, 142 F.3d 1463, 1467 (Fed. Cir. 1998) (internal citations omitted)); Jowett, Inc. v. United States, 234 F.3d 1365, 1368 (Fed. Cir. 2000) (quoting McAbee Constr., Inc. v. United States, 97 F.3d at 1435; Harris v. Dep't of Veterans Affairs, 142 F.3d at 1467); see also Shell Oil Co. v. United States, 751 F.3d 1282, 1305 (Fed. Cir. 2014) (noting that a contract must be interpreted in context, giving meaning to the document as a whole) (citing NVT Techs., Inc. v. United States, 370 F.3d 1153, 1159 (Fed. Cir. 2004); Metric Constructors, Inc. v. Nat'l Aeronautics & Space Admin., 169 F.3d 747, 752 (Fed. Cir. 1999)); McHugh v. DLT Solutions, Inc., 618 F.3d 1375, 1380 (Fed. Cir. 2010); Giove v. Dep't of Transp., 230 F.3d 1333, 1340–41 (Fed. Cir. 2000) ("In addition, we must interpret the contract in a manner that gives meaning to all of its provisions and makes sense. Further, business contracts must be construed with business sense, as they naturally would be understood by intelligent men of affairs.")

6

(citations omitted); Gould, Inc. v. United States, 935 F.2d 1271, 1274 (Fed. Cir. 1991) (indicating that a preferable interpretation of a contract is one that gives meaning to all parts of the contract rather than one that leaves a portion of the contract "useless, inexplicable, void, or superfluous"); Marquardt Co. v. United States, 101 Fed. Cl. 265, 269 (2011) ("In interpreting contractual language, the court must give reasonable meaning to all parts of the contract and avoid rendering portions of the contract meaningless." (citation omitted)); Enron Fed. Solutions, Inc. v. United States, 80 Fed. Cl. 382, 393 (2008) ("[C]ontext defines a contract and the issues deriving thereof."); Hol-Gar Mfg. Corp. v. United States, 169 Ct. Cl. 384, 388, 351 F.2d 972, 975 (1965) (The language of the "contract must be given that meaning that would be derived from the contract by a reasonable intelligent person acquainted with the contemporaneous circumstances."). "'"In contract interpretation, the plain and unambiguous meaning of a written agreement controls." The contract must be construed to effectuate its spirit and purpose giving reasonable meaning to all parts of the contract.'" Arko Exec. Servs., Inc. v. United States, 553 F.3d 1375, 1379 (Fed. Cir. 2009) (quoting Hercules Inc. v. United States, 292 F.3d 1378, 1380–81 (Fed. Cir.), reh'g and reh'g en banc denied (Fed. Cir. 2002) (quoting Craft Mach. Works, Inc. v. United States, 926 F.2d 1110, 1113 (Fed. Cir. 1991))); see also LAI Servs., Inc. v. Gates, 573 F.3d at 1314; Gardiner, Kamya & Assocs., P.C. v. Jackson, 467 F.3d 1348, 1353 (Fed. Cir. 2006) (citations omitted); Medlin Constr. Grp., Ltd. v. Harvey, 449 F.3d 1195, 1200 (Fed. Cir. 2006) (reviewing the contract as a whole to determine the meaning of relevant provisions); Hunt Constr. Grp., Inc. v. United States, 281 F.3d 1369, 1372 (Fed. Cir. 2002) ("We begin with the plain language when interpreting a contract . . . . The contract must be considered as a whole and interpreted to effectuate its spirit and purpose, giving reasonable meaning to all parts." (citations omitted)). "'[I]t has been a fundamental precept of common law that the intention of the parties to a contract control[s] its interpretation.'" Beta Sys., Inc. v. United States, 838 F.2d 1179, 1185 (Fed. Cir. 1988) (quoting Firestone Tire & Rubber Co. v. United States, 444 F.2d 547, 551 (Ct. Cl. 1971)); Alvin, Ltd. v. United States Postal Serv., 816 F.2d 1562, 1565 (Fed. Cir. 1987) ("In the case of contracts, the avowed purpose and primary function of the court is the ascertainment of the intent of the parties."); see also Flexfab, LLC v. United States, 424 F.3d 1254, 1262 (Fed. Cir. 2005) ("[I]ntent is determined by looking to the contract and, if necessary, other objective evidence. In the absence of clear guidance from the contract language, the requisite intent on the part of the government can be inferred from the actions of the contracting officer. . . .").

In the contract at issue, neither the contract specifications nor the 2014 version of the EM 385-1-1 Manual, which was incorporated by reference into the contract, explicitly disallow the project superintendent from functioning as the SSHO.[3] As stated above, Appendix Q of the EM 385-1-1 Manual defines the "Site Safety and Health Officer

---

[3] The court reviewed the contract between the parties, as well as plaintiff's proposal in response to the solicitation, in order to determine whether the agreement between the parties contained any additional references to the SSHO and the superintendent, other than the references in the contract specifications and in the EM 385-1-1 Manual cited by the parties. After reviewing these documents, the court confirmed that plaintiff and defendant had identified the only relevant references to the SSHO and superintendent positions.

(SSHO)" as "the superintendent or other qualified or competent person who is responsible for on-site safety and health." Pursuant to this definition, it appears that the superintendent may function as the SSHO. Section 1.5 of the contract requires the contractor to comply with the EM 385-1-1 Manual as one of several publications that "form a part of this specification to the extent referenced." Notwithstanding defendant's argument that the contract specifications do not specifically reference the definition of the SSHO contained in Appendix Q of the EM 385-1-1 Manual, the EM 385-1-1 Manual definitions in Appendix Q are integral to and a defining part of the provisions in the EM 385-1-1 Manual. In order to understand the duties and responsibilities of the SSHO, it would not make sense for the court to disregard the definitions section of the EM 385-1-1 Manual when reading and interpreting the directions in the EM 385-1-1 Manual.

As noted above, the contract specifications and the EM 385-1-1 Manual describe the obligations and responsibilities of the SSHO, and there is no language in these provisions stating that the person functioning as the SSHO cannot have any other duties or responsibilities for the project. The contract specifications explain that the contractor must provide a minimum of one person at each project site to function as the SSHO, and that the SSHO will have multiple, daily obligations to fulfill. According to defendant, because the EM 385-1-1 Manual provides that the SSHO shall be a "full-time responsibility" and shall be "an employee other than the supervisor," this precludes another employee, including the superintendent, from spending only part of his or her time as the SSHO. The contract, however, does not limit the functions of the SSHO to only the specific duties set forth in the contract, and the contract specifications do not establish that the superintendent position is a full-time responsibility. Thus, under the terms of the contract, an individual should be allowed to serve full-time as the SSHO and also perform additional functions as the project superintendent.

The EM 385-1-1 Manual also states pursuant to section 01.A.17, "[t]he Contractor shall employ a minimum of one CP [Competent Person] at each project site to function as the SSHO (primary), depending on job complexity, size, and any other pertinent factors." The contract does not further define the use of the term "primary." By stating that a person must serve in a "primary" role as the SSHO, this language appears to indicate that the person may be permitted to perform additional functions as a secondary role. The court also notes that, for at least one other personnel position, the contract at issue specifically limited the individual's ability to perform other functions. In contract Section 1.5.1, the contract specifications required the contractor to provide a Quality Control Manager and directed that "[t]he only duties and responsibilities of the Quality Control Manager are to manage and implement the Quality Control program on this Contract." This language prohibits the Quality Control Manager from performing tasks under the contract other than those of the Quality Control Manager. This specific, limiting language suggests that, had defendant, as the drafter of the solicitation and contract, wanted to use similar language to disallow the SSHO from performing other duties under the contract, defendant could have done so, but chose not to do so. That the contract uses such limiting language with regard to one position, but not with regard to the position of the SSHO, is evidence that the SSHO should have been permitted to perform additional functions.

With regard to defendant's assertion that the project superintendent cannot serve in a dual role as the SSHO because the EM 385-1-1 Manual states that the SSHO shall "[b]e an employee other than the supervisor, unless specified differently in the contract," the court refers to the glossary definition of the SSHO in Appendix Q of the EM 385-1-1 Manual. Defendant, however, points to a Merriam-Webster definition of "superintendent" and asserts that "supervisor" is a synonym for the term "superintendent."[4] According to defendant, the term "supervisor" in the EM 385-1-1 Manual is not capitalized or otherwise treated as a defined term, which should indicate that "the contract broadly proscribed using persons on the contract otherwise performing supervisory roles as SSHO." Notwithstanding defendant's argument, the definition of SSHO as provided in the EM 385-1-1 Manual specifically states that the SSHO may be the superintendent: "the superintendent or other qualified or competent person who is responsible for on-site safety and health." That defendant relies on secondary sources for a definition regarding the term "superintendent" is not persuasive, given that the contract between the parties provides the pertinent definition for the SSHO.

The court recognizes that the contract specifications and the EM 385-1-1 Manual refer, in some instances, to the superintendent and to the SSHO in the same section. For instance, Section 1.6.2.1 of the contract states that the "[f]ailure to perform the above duties will result in dismissal of the superintendent, QC [Quality Control] manager, and/or SSHO, and a project work stoppage." In describing who would be required to attend the preconstruction conference, Section 1.6.3.1 of the contract identifies "the project superintendent, site safety and health officer, [and] quality control supervisor." Similarly, in describing who must sign the Accident Prevention Plan, Section 1.7 of the contract lists the contractor, "the on-site superintendent," and "the designated site safety and health officer." Additionally, Section 1.7 of the contract requires that changes to the Accident Prevention Plan "be made with the knowledge and concurrence of the Contracting Officer, project superintendent, SSHO and quality control manager." These references, however, do not establish that the project superintendent could not serve in a dual role as the SSHO. The contract requires that each of these positions be filled and that the obligations and responsibilities of these positions be performed, but does not address or prohibit one individual from fulfilling more than one of the required responsibilities. It appears that the only limitation in the contract on performing dual functions pertains to the Quality Control Manager.

Based on a review of the contract specifications and the EM 385-1-1 Manual, and giving meaning to all of the relevant provisions in the contract and the EM 385-1-1 Manual, the court finds that the plain language of the contract does not prohibit the project superintendent from serving as the SSHO. Moreover, even if the court had concluded that the contract was ambiguous with regard to the project superintendent's ability to serve as the SSHO, such an ambiguity would have been considered latent and plaintiff's contract interpretation was reasonable, especially given defendant's role as the drafter of the contract. See HPI/GSA 3C, LLC v. United States, 364 F.3d 1327, 1334 (Fed. Cir.

---

[4] Defendant cites to the "Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/superintendent (2017)."

9

2004) ("The general rule is *contra proferentem*, which requires ambiguities in a document to be resolved against the drafter."). The court finds that, in this case, any possible ambiguity would have been found not so "obvious, gross, [or] glaring" that plaintiff was obligated to inquire about it prior to submitting its proposal for the contract. See West Bay Builders, Inc. v. United States, 85 Fed. Cl. 1, 15 (2008) ("A patent ambiguity is one that is obvious, gross, glaring, so that [the] plaintiff contractor had a duty to inquire about it at the start."). In this case, no ambiguity was apparent on the face of the contract.

## CONCLUSION

For the reasons stated above, defendant's motion in limine is **DENIED**. The court will schedule a status conference to discuss further proceedings in the above-captioned case by separate Order.

**IT IS SO ORDERED**.

s/Marian Blank Horn
**MARIAN BLANK HORN**
**Judge**